**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

CONSERVATION LAW FOUNDATION, INC.      )
                                       )
              Plaintiff,               )
                                       )
v.                                     )      Case No. 15-cv-230
                                       )
D'AGOSTINOS AUTO SALES & SALVAGE,      )
INC.                                   )      NO JURY TRIAL
                                       )
              Defendant.               )
                                       )

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**

Plaintiff Conservation Law Foundation, Inc., ("CLF") by and through its counsel, hereby alleges:

**I. INTRODUCTION**

1.    This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.* (the "Clean Water Act," "the Act," or "CWA").  Defendant D'Agostinos Auto Sales & Salvage, Inc. ("D'Agostinos Auto") has violated the Clean Water Act through its continuous and ongoing unauthorized discharges of polluted stormwater runoff from the automobile salvage yard facility located at 1174 Douglas Ave., North Providence, Rhode Island, 02904 ("the Facility") into waters of the United States, and through its failure to comply with the Rhode Island Pollutant Discharge Elimination System ("RIPDES") Multi-Sector General Permit for Storm Water Discharges Associated with Industrial Activity ("MSGP").  Plaintiff seeks a declaratory judgment, injunctive relief, and other relief the Court deems appropriate to correct these violations.

Page 1 of 19

2. The West River (Waterbody ID RI0003008R-03B) is within the Narragansett Watershed. The West River is a tributary to the Moshassuck River, which converges with the Woonasquatucket River to form the Providence River; the Providence River converges with the Seekonk River and flows into the Narragansett Bay. The Narragansett Watershed is home to aquatic life, plants, and animal species that rely on the West River, its tributaries, downstream receiving waters, and adjacent wetlands for their survival.

3. The Clean Water Act requires that states establish minimum water quality criteria and standards to protect human health and aquatic life. CWA §§ 303-304, 33 U.S.C. §§ 1313-1314.

4. The West River is a Category 5 Waterbody, indicating that it is impaired for one or more uses and requires a Total Maximum Daily Load ("TMDL"). Under the Rhode Island Water Quality Regulations, the West River has been classified as a Class B fresh water stream "designated for fish and wildlife habitat and primary and secondary contact recreational activities" and "shall have good aesthetic value." Rule 8(B)(1)(c).

5. The West River does not meet these standards, and the United States Environmental Protection Agency ("EPA") has designated the West River as impaired pursuant to section 303(d) of the Clean Water Act for failure to meet minimum water quality standards for *Enterococcus*.

6. The Moshassuck River is a Category 5 Waterbody, indicating that it is impaired for one or more uses and requires a TMDL. Under the Rhode Island Water Quality Regulations, the Moshassuck River has been classified as a Class B fresh water stream "designated for fish and wildlife habitat and primary and secondary contact recreational activities" and "shall have good aesthetic value." Rule 8(B)(1)(c).

7.    The Moshassuck River does not meet these standards, and EPA has designated the Moshassuck River as impaired pursuant to Clean Water Act § 303(d) for failure to meet minimum water quality standards for *Enterococcus*.

8.    The Providence River is a Category 5 Waterbody, indicating that it is impaired for one or more uses and requires a TMDL. Under the Rhode Island Water Quality Regulations, the Providence River has been classified as a Class SB1(a) seawater stream "designated for primary and secondary contact recreational activities and fish and wildlife habitat" and "shall have good aesthetic value." Rule 8(B)(2)(c).

9.    The Providence River does not meet these standards, and EPA has designated the Providence River as impaired pursuant to the Clean Water Act § 303(d) for failure to meet minimum water quality standards for nitrogen, dissolved oxygen, and fecal coliform.

10.    The Upper Narragansett Bay is a Category 5 Waterbody, indicating that it is impaired for one or more uses and requires a TMDL. Under the Rhode Island Water Quality Regulations, the Upper Narragansett Bay has been classified as a Class SA seawater stream designated for primary and secondary contact recreational activities and fish and wildlife habitat" and "shall have good aesthetic value." Rule 8(B)(2)(a).

11.    The Upper Narragansett Bay does not meet these standards, and EPA has designated the Providence River as impaired pursuant to the Clean Water Act § 303(d) for failure to meet minimum water quality standards for nitrogen, dissolved oxygen, and fecal coliform.

12.    The Rhode Island Water Quality Regulations establish surface water standards to protect the surface waters from pollutants including, but not limited to chemical wastes,

biological materials, oil, or any material which will likely alter the characteristics of water.  Rules 1&7.

13.     Stormwater runoff is one of the major sources of contamination of the West River, the Moshassuck River, and downstream receiving waters.

14.     Stormwater is water that flows across the ground and pavement after rainfall or snowmelt.

15.     The Facility owned by D'Agostinos Auto, located adjacent to the West River, engages in industrial activities such as vehicle dismantling and processing; used parts storage; outdoor vehicle and equipment storage; vehicle and equipment maintenance; vehicle, equipment, and parts washing; liquid storage; and vehicle traffic in and out of the Facility. As rain and snow come into contact with pollutants generated by these activities, it picks up the pollutants and is conveyed to West River and downstream receiving waters.

## II. JURISDICTION AND VENUE

16.     This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* (the "Clean Water Act," "the Act," or "CWA").  This Court has subject matter jurisdiction over the parties and this action pursuant to CWA § 505(a)(1), 33 U.S.C. § 1365(a)(1), and 28 U.S.C. § 1331 (an action arising under the Constitution and laws of the United States).

17.     Plaintiff has complied with the statutory notice requirements under CWA § 505(a)(1) of 33 U.S.C. § 1365(a)(1) and the corresponding regulations at 40 C.F.R. § 135.2.

12.     On March 5, 2015, Plaintiff provided D'Agostinos Auto with notice of its intention to file suit for violations of the Clean Water Act and the Multi-Sector General Permit by

sending a sixty-day notice letter ("Notice Letter") via certified mail to Elias T. Ayoub, the President of D'Agostinos Auto; Dolores D'Agostino, the Registered Agent, Treasurer and Secretary of D'Agostinos Auto; and Carlo Fakhri, the Vice President of D'Agostinos Auto, regarding D'Agostinos Auto's violations of the CWA and the MSGP. 33 U.S.C. § 1365(a)(1); 40 C.F.R. § 135.2(a)(1).

13.    A copy of the Notice Letter was sent to the Administrator of the EPA, the Administrator of EPA Region I, and the Director of the Rhode Island Department of Environmental Management ("RIDEM") pursuant to CWA, 33 U.S.C. § 1365(b)(1)(A) and 40 C.F.R. § 135.2(a)(1).

14.    A true and correct copy of Plaintiff's Notice Letter is attached as Attachment A to this Complaint and is incorporated here by reference.

15.    More than sixty days have passed since the Notice Letter was served on Defendant.

16.    Neither the EPA nor the State of Rhode Island has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. 33 U.S.C. § 1365(b)(1)(B).

17.    Venue is proper in the District Court of Rhode Island pursuant to CWA § 505(c)(1), 33 U.S.C. § 1365(c)(1) because the source of the violations is located within this judicial district.

### III. PARTIES

18.    Plaintiff Conservation Law Foundation, Inc. ("CLF") if a not-for-profit, member-supported environmental advocacy organization incorporated under the laws of Massachusetts with an office at 55 Dorrance Street, Providence, Rhode Island, 02903 and a principal place of business at 62 Summer Street, Boston, Massachusetts, 02110.

19. CLF is a regional organization with about 4,000 members throughout New England, including about 200 members in Rhode Island. CLF is dedicated to protecting New England's environment for the benefit of all people. CLF has a long history of working to reduce stormwater pollution by enforcing the Clean Water Act on behalf of its members.

20. CLF's mission includes the conservation and protection of the many uses of the waters in and around the Narragansett Watershed for, among other things, fishing, recreation, boating, scenic and aesthetic enjoyment, and scientific purposes. To further these goals, CLF actively seeks federal and state agency implementation of the Clean Water Act and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

21. CLF has an interest in protecting and restoring the quality of Rhode Island's waters on behalf of its members.

22. Members of CLF live on or near the West River and the Moshassuck River and use and enjoy the Narragansett Watershed for recreational, aesthetic, and scientific purposes.

23. Discharges of pollutants by Defendant adversely affect CLF members' use and enjoyment of the Narragansett Watershed.

24. The interests of CLF's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the CWA and the MSGP. The relief sought will redress the harms to Plaintiff by Defendant's activities. Continuing commission of the acts and omissions alleged above have and will continue to irreparably harm Plaintiff's members, for which harm they have no plain, speedy, or adequate remedy at law.

25. Defendant is a corporation organized under the laws of the State of Rhode Island.

26. Defendant operates an auto salvage facility located at 1174 Douglas Avenue, North Providence, RI 02904 ("the Facility"). The Facility has a singular entry and exit point for vehicles on Douglas Avenue, multiple structures, and interior roads running between and around the outdoor, uncovered storage areas for junked cars.

27. The Facility has approximately 270 feet of frontage on the West River.

28. Defendant has stored uncovered junked cars in storage areas adjacent to the West River. An aerial image of Defendant's Facility showing its proximity to the West River is attached as Attachment B.

29. Upon information and belief, the Facility is not covered by either an individual RIPDES permit or the MSGP.

30. Elias T. Ayoub is the president of D'Agostinos Auto.

31. Dolores D'Agostino is the treasurer, secretary, and registered agent for D'Agostinos Auto.

32. Defendant maintains, operates, and is responsible for industrial activities at the Facility.

## IV. STATUTORY BACKGROUND

### The Clean Water Act

33. Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United states from a "point source," unless the discharge complies with various enumerated sections of the Act. Among other things, section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a valid permit issued pursuant to § 402(p) of the Act, 33 U.S.C. § 1342(p).

34.     "Point source" is defined broadly under § 502(14) of the Act to include, "any discernible, confined, and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." CWA § 502(14), 33 U.S.C. § 1362(14).

35.     Congress amended the Clean Water Act in 1987 to require that certain industrial facilities obtain stormwater discharge permits. Water Quality Act of 1987, Pub. L. No. 100-4, § 405, 101 Stat 7 (1987); *see* 55 Fed. Reg. 47990, 47991-93 (Nov. 16, 1990).

36.     Section 402 of the Act requires that National Pollutant Discharge Elimination System permits be issued for stormwater discharges associated with industrial activities. CWA §§ 402(a)(1), 402(p)(2), 402(p)(3)(A), 402(p)(4), 402(p)(6); 33 U.S.C. §§ 1342(a)(1), 1342(p)(2), 1342(p)(3)(A), 1342(p)(4), 1342(p)(6).

37.     EPA regulations set forth at 40 C.F.R. § 122.26 required industrial dischargers to submit applications for permit coverage no later than October 1, 1992. 73 Fed. Reg. 56572; 2008 MSGP Table 1-2.

38.     In establishing these regulations, EPA cited abundant data showing the harmful effects of stormwater runoff on rivers, streams, and coastal areas across the nation. In particular, EPA found that runoff from industrial facilities contained elevated pollution levels. 55 Fed. Reg. 47990, 47991 (Nov. 16. 1990).

39.     EPA has delegated authority to the State of Rhode Island to implement a National Pollutant Discharge Elimination System permitting program under the Clean Water Act.

40. RIDEM has issued a Multi-Sector General Permit ("MSGP") for industrial sources of polluted stormwater runoff under the Rhode Island Pollutant Discharge Elimination System ("RIPDES").

41. In October 2005, RIDEM issued an MSGP with an effective date of May 1, 2006, requiring all covered facilities to file a Notice of Intent ("NOI") for coverage under the MSGP.

42. Thereafter, RIDEM issued an MSGP with an effective date of August 15, 2013, requiring all covered facilities to file an NOI.

43. In order to discharge stormwater lawfully, industrial dischargers must obtain coverage under the MSGP and comply with its terms. MSGP Part I(B)(1)(a); U.S.C. § 1342(p).

44. Industrial dischargers must also develop and implement a Storm Water Management Plan ("SWMP"). *See* MSGP Part V.

45. The SWMP must include, but is not limited to, the following: information related to a company stormwater pollution prevention team, a site description and general location map, a summary of pollutant sources, a description of control measures, and schedules and procedures pertaining to control measures and monitoring. *See* MSGP Part V(F). To discharge under the MSGP, the Facility must select, design, install, and implement control measures (including best management practices) to prevent polluted stormwater discharges from reaching nearby waterbodies. *See* MSGP Part II(A).

46. Section 505(a)(1) the Clean Water Act, 33 U.S.C. § 1365(a)(1), provides for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation."

47. Such enforcement action under Clean Water Act section 505(a) includes an action seeking remedies for unauthorized discharge under CWA § 301, 33 U.S.C. § 1311, as well as for violation of a permit condition under CWA § 402, 33 U.S.C. § 1342, and § 505 (f) of the Act, 33 U.S.C. § 1365(f).

48. Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $37, 500 per day per violation for all violations occurring after January 12, 2009 pursuant to CWA § 309(d) and 505(a), 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1-19.4.

**V. FACTS**

49. Defendant has operated and continues to operate an automobile salvage yard facility at 1174 Douglas Avenue, North Providence, Rhode Island, 02904 since at least 1983.

50. Upon information and belief, stormwater from the Facility flows into a catch basin in the street.

51. Upon information and belief, stormwater from the Facility has discharged and continues to discharge into the West River and thence into the Moshassuck River and downstream receiving waters.

52. Upon information and belief, to the extent (if any) that stormwater flow is intercepted by any berm along the shore of the West River, the intercepted stormwater enters the West River via a direct, shallow, hydrological connection through the ground.

53. The primary activity at the Facility falls under Standard Industrial Classification ("SIC") Code 5015, the listed codes in Appendix B of the MSGP, and/or the activities listed in 40 C.F.R. § 122.26(b)(14).

54. Upon information and belief, Defendant has engaged and continues to engage in the following industrial operations at the Facility: vehicle dismantling; used parts storage;

outdoor vehicle and equipment storage; vehicle and equipment maintenance; vehicle, equipment, and parts washing; and liquid storage.

55.   Upon information and belief, the sources of pollutants associated with the industrial activities at the Facility include: vehicle dismantling, crushing, and storage areas; shipping and receiving areas; oil-stained dirt and pavement; vehicles entering and exiting the Facility; liquid storage areas; junked cars and car parts; and on-site material handling equipment such as forklifts.

56.   Upon information and belief, pollutants present in stormwater discharged from the Facility include, but are not limited to: oil and grease; ethylene glycol; toxic and heavy metals; mercury; sulfuric acid; galvanized metals; aluminum; petroleum hydrocarbons; suspended solids; arsenic; organics; chlorinated solvents; acid/alkaline wastes; phosphorous; salts; antifreeze, transmission and brake fluids; nutrients; pathogens; trash; hydraulic fluids; acids and solvents; sediment and total suspended solids; pH-affecting substances; fugitive and other dust, dirt, and debris, and elevated temperature.

57.   The vehicle dismantling, processing, and storage areas; shipping and receiving areas; oil-stained dirt and pavement; liquid storage areas; junked cars and car parts; and on-site material handling equipment at the Facility have been uncovered, and therefore exposed to rain water and snow.

58.   Upon information and belief, materials associated with industrial activities that are exposed to the elements at the Facility include, but are not limited to: oil, anti-freeze, batteries, gasoline, diesel fuel, hydraulic fluids, electrical switches, batteries, chrome bumpers, wheel balance weights, tires, rims, filters, radiators, catalytic converters, engine blocks, hub caps, doors, drivelines, galvanized metals, mufflers, leaking engines,

chipping/corroding bumpers, chipping paint, galvanized metal, greasy rags, oil filters, air filter, batteries, hydraulic fluids, transmission fluids, radiator fluids, degreasers, electric motors, lead, AC compressors, auto radiators, condensers, motor parts, heat exchangers, zinc, wire, cable, nickel alloys, junk cars, automotive engines, tire rims, and tanks contaminated with industrial pollutants.  These materials contain or are contaminated with the pollutants listed at Paragraph 56 above.

59.    Defendant has operated and continues to operate trucks and other vehicles that enter and exit the Facility via driveways or access roads.

60.    Upon information and belief, the vehicles referenced in Paragraph 59, above, transport pollutants including, but not limited to: hydrocarbons (oil, grease, fuel), metals, total suspended solids, sediment, road salt (which in turn contains chlorides, sodium, and impurities), onto and off the Facility and into the waters of the United States.

61.    During every measurable rainfall and snowmelt, water flows onto and over exposed materials and accumulated pollutants at the Facility, generating stormwater runoff.

62.    Stormwater runoff from the Facility is contaminated with pollutants from the industrial materials and activities at the Facility.

63.    Upon information and belief, Defendant has discharged and continues to discharge stormwater runoff via a catch basin, site grading, ditches, swales, berms, the operation of gravity, direct hydrological connections through the ground, and other conveyances into the West River and downstream receiving waters.

64.    Upon information and belief, stormwater runoff from the Facility is not treated to remove the pollutants referenced at Paragraphs 56 and 60, above, before it is discharged into the West River and downstream receiving waters.

65.   EPA considers measurable rainfall an amount above 0.1 inches during a 24-hour period. 40 C.F.R. § 122.26(c)(i)(E)(6).

66.   During every measurable rainfall and every instance of snowmelt, water flows onto and over exposed materials and accumulated pollutants at the Facility, generating stormwater runoff associated with the Facility's industrial activity, and flows into the West River, the Moshassuck River, the Providence River, and the Narragansett Bay.

67.   The MSGP specifically references snowmelt as a form of stormwater discharge that must be addressed by a discharger in its control measures. MSGP II(A)(2)(a).

68.   The West River is considered a "water of the United States" as defined in 40 C.F.R. § 122.2, and therefore is a "navigable water" as defined in 33 U.S.C. § 1362(7).

69.   Rhode Island's impaired waters list identifies the West River as impaired pursuant to CWA § 303 (d), 33 U.S.C. § 1313(d).

70.   Defendant has not met and continues to fail to meet the requirements to obtain authorization to discharge stormwater under the MSGP or any other valid authorization for the Facility.

71.   Upon information and belief, Defendant has failed to install and implement control measures to meet numeric and non-numeric effluent limitations in MSGP II(A)(3) at the Facility.

72.   Defendant has failed to develop and implement a complete and accurate Stormwater Management Plan that meets the requirements of MSGP Part I(C)(1)(a), before submitting a Notice of Intent to obtain permit coverage for the Facility.

73.   Defendant has not filed a complete and accurate Notice of Intent with RIDEM.

74.   Defendant is not authorized to discharge from the Facility under the MSGP until all requirements of the MSGP have been fulfilled and sixty days have passed since submitting the Notice of Intent to RIDEM.

## VI. CLAIMS FOR RELIEF

**First Cause of Action: Unauthorized Discharge of Pollutants Into Waters of the United States**

75.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

76.   Section 301 (a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant from any point source into waters of the United States, except for discharges in compliance with the requirements of a permit issued pursuant to CWA § 402(p), 33 U.S.C. § 1342(p).

77.   In order to be authorized to discharge lawfully under the Multi-Sector General Permit, an industrial discharger's facility must meet requirements set forth in Part I of the Multi-Sector General Permit.  These requirements include:

   (a) establishing eligibility for coverage under the permit

   (b) selecting, designing, installing, and implementing control measures in accordance with Multi-Sector General Permit Part II(A);

   (c) developing a complete and accurate Stormwater Management Plan in accordance with the permit's requirements; and

   (d) filing a complete and accurate Notice of Intent to seek coverage under the permit.

78.   Defendant is required to obtain permit coverage for its Facility and comply with the Multi-Sector General Permit pursuant to § 402 of the Clean Water Act, 33 U.S.C. § 1342.

79. Defendant's industrial activities at the Facility have resulted and continue to result in "stormwater discharge associated with an industrial activity" within the meaning of 40 C.F.R. § 122.26(b)(14) into the West River and downstream receiving waters on every day of rainfall greater than 0.1 inches and every instance of snowmelt.

80. Defendant's discharges of stormwater associated with industrial activity ("industrial stormwater discharges") are discharges of pollutants within the meaning of 33 U.S.C. § 1362(12).

81. Defendant's industrial stormwater discharges at the Facility are point source discharges into waters of the United States in violation of Clean Water Act § 301(a), 33 U.S.C. § 1311(a).

82. Since at least March 5, 2010, Defendant has discharged and continues to discharge industrial stormwater without authorization under a valid RIPDES permit as required by Clean Water Act § 301(a), 33 U.S.C. § 1311(a) and § 402(p)(2)(B), 33 U.S.C. 1342(p)(2)(b).

83. Each and every day since at least March 5, 2010, on which Defendant has discharged and continues to discharge industrial stormwater from the Facility without authorization under a valid RIPDES permit constitutes a distinct violation of Clean Water Act § 301(a), 33 U.S.C. § 1311(a) and § 402, 33 U.S.C. § 1342.

**Second Cause of Action: Failure to Obtain a Permit for Industrial Stormwater Discharges**

84. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

85. Defendant has been required to obtain permit coverage for its industrial stormwater discharges under each of the Multi-Sector General Permits issued by RIDEM, including

the Multi-Sector General Permit effective August 15, 2013, or by seeking and obtaining an individual RIPDES permit pursuant to section 402 of the Clean Water Act, 33 U.S.C. § 1342.

86. Defendants have failed, and continue to fail, to obtain permit coverage under the Multi-Sector General Permit effective August 15, 2013, or any other iteration of the MSGP, or an individual RIPDES permit for its facility.

87. Each and every day on which Defendant has not had permit coverage for its Facility under the Rhode Island Pollutant Discharge Elimination System is a separate and distinct violation of Clean Water Act § 301(a), 33 U.S.C. § 1311(a) and § 402, 33 U.S.C. § 1342.

**Third Cause of Action: Failure to Comply with a Permit for Industrial Stormwater Discharges**

88. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

89. Industrial dischargers are required at a minimum to comply with the requirements of the Multi-Sector General Permit, which include but are not limited to:

(a) developing and implementing a complete and accurate Stormwater Management Plan, which, in the case of the Defendant's Facility, would require a number of stormwater management measures and controls to meet numeric and non-numeric effluent limits;

(b) submitting a complete Notice of Intent to be covered by the Multi-Sector General Permit, accompanied by a complete and accurate Stormwater Management Plan;

(c) implementing required stormwater control measures;

(d) conducting facility inspections (Multi-Sector General Permit Part IV(A));

(e) collecting stormwater samples from each outfall at the Facility and inspecting the same for indicators of pollution (Multi-Sector General Permit Parts IV(A)(1),(3) & (B));

(f) conducting annual comprehensive site inspections and submitting the results thereof to RIDEM (Multi-Sector General Permit Parts IV(C) and VII(B));

(g) complying with the required benchmark monitoring and sampling procedures (Multi-Sector General Permit Part VI(B));

(h) monitoring for all pollutants for which a receiving waterbody is impaired and for which a standard analytical method exits (Multi-Sector General Permit Part VI);

(i) complying with reporting and recordkeeping requirements, including but not limited to reporting of any noncompliance within an applicable time period (Multi-Sector General Permit Part VII); and

(j) satisfying sector-specific requirements such as, in the case of the Defendant's Facility, requirements pertaining specifically to automobile salvage yards and scrap metal recycling facilities (Multi-Sector General Permit Part VIII Subpart M).

90. Defendant has failed and continues to fail to comply with the requirements of the Multi-Sector General Permit, including each of the requirements described above.

91. Each and every day on which Defendant has failed to comply with the Multi-Sector General Permit is a separate and distinct violation of Clean Water Act § 301(a), 33 U.S.C. § 1311(a), and § 402, 33 U.S.C. § 1342.

## VII. RELIEF REQUESTED

92. Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

(a) Declare Defendant to have violated and to be in violation of § 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), for its unlawful and unauthorized discharges of pollutants at the Facility;

(b) Declare Defendant to have violated and to be in violation of § 402 of the Clean Water Act, 33 U.S.C. § 1342, for its failure to obtain coverage under the Multi-Sector General Permit issued under the Rhode Island Pollutant Discharge Elimination System by the State of Rhode Island;

(c) Declare Defendant to have violated and to be in violation of section 402 of the Clean Water Act, 33 U.S.C. § 1342, for its failure to comply with all applicable requirements of the Multi-Sector General Permit.

(d) Enjoin Defendant from discharging pollutants from the Facility and into the surface waters surrounding and downstream from the Facility except as authorized and in compliance with a Rhode Island Pollutant Discharge Elimination System permit;

(e) Order Defendant to comply fully and immediately with all applicable requirements of the Multi-Sector General Permit for the Facility;

(f) Order Defendant to pay civil penalties of $37,500 per day per violation for all violations occurring after January 12, 2009, for each violation of the Clean Water Act at the Facility pursuant to §§ 309(d) and 505(a) of the CWA, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§19.1-19.4;

(g) Order Defendant to take appropriate actions to remedy the harm caused by its noncompliance with the Clean Water Act;

(h) Award Plaintiff's costs (including reasonable investigative, attorney, witness, and

consultant fees) as permitted by § 505(d) of the CWA, 33 U.S.C. § 1365(d); and

(i) Award any such other and further relief as this Court may deem appropriate.

## VIII. NO PRIOR LAWSUITS

CLF has filed no prior related lawsuits against Defendant seeking redress for these violations

under the Clean Water Act.

## IX. NO JURY TRIAL DEMAND

Consistent with its right under the Clean Water Act to bring a citizen suit, CLF does not seek a

jury trial.

Dated: June 5, 2015

Respectfully submitted,

CONSERVATION LAW FOUNDATION, INC.

By its attorney:

/s/ Max Greene

Max Greene, RI Bar No. 7921
Conservation Law Foundation
55 Dorrance Street
Providence, RI 02903
(401) 351-1102 x2013
mgreene@clf.org