# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| CONSERVATION LAW FOUNDATION, INC.<br>Plaintiff,<br><br>v.<br><br>D'AGOSTINOS AUTO SALES & SALVAGE,<br>INC.<br>Defendant<br>_____<br><br>D'AGOSTINOS AUTO SALES & SALVAGE,<br>INC.<br>Third-Party Plaintiff,<br><br>v.<br><br>DELORES R. D'AGOSTINO, and<br>RONALD C. D'AGOSTINO<br>Third-Party Defendants<br>_____ | Case No. 15-cv-230-M-PAS<br>(Hon. John J. McConnell, Jr.) |

 **CONSENT DECREE**

WHEREAS, Plaintiff Conservation Law Foundation, Inc. ("CLF") filed this action on June 5, 2015 against Defendant D'Agostinos Auto Sales & Salvage, Inc. ("D'Agostinos Auto"), alleging violations of the Clean Water Act, 33 U.S.C. §§ 1251 *et seq.*, and seeking declaratory and injunctive relief, civil penalties, and attorneys' fees and costs;

WHEREAS, D'Agostinos Auto owns and operates a facility located at 1174 Douglas Avenue, North Providence, RI 02904 (the "Facility") that has operated as an automobile salvage yard;

WHEREAS, D'Agostinos Auto filed a Motion for Leave to File a Third Party Complaint, which represented that the corporation's current owners had purchased the corporation and its assets from Dolores R. D'Agostino and Ronald C. D'Agostino ("the D'Agostinos") just five days before receiving CLF's Notice of Intent to sue;

WHEREAS, D'Agostinos Auto filed a third-party complaint against the D'Agostinos, alleging a claim for contribution and indemnification based on the terms of a contract between D'Agostinos Auto and the D'Agostinos;

WHEREAS, CLF alleges that stormwater associated with industrial activity discharged from the Facility to the West River without a discharge permit;

WHEREAS, CLF is a regional, nonprofit environmental organization;

WHEREAS, CLF has alleged, in its complaint (the "Complaint") and in a letter (the "Notice Letter") dated March 5, 2015, sent to D'Agostinos Auto and others, that D'Agostinos Auto has violated and continues to violate Section 505 of the Federal Clean Water Act ("CWA" or "Act"), 33 U.S.C. § 1365(a);

WHEREAS, CLF, D'Agostino Auto, and the D'Agostinos (collectively, "the Parties" or individually "Party") agree that resolution of this matter without further litigation is in the best interest of the Parties and the public, and that entry of this Decree is the most appropriate means of resolving this action;

WHEREAS, D'Agostinos Auto does not admit any allegation and/or liability asserted by CLF in the above-captioned matter; and

WHEREAS, Dolores R. D'Agostino and Ronald C. D'Agostino do not admit any allegations and/or liability asserted by CLF and D'Agostino Auto Sales and Salvage, Inc.;

NOW, THEREFORE, without the trial of any issue of fact or law, without the admission by D'Agostinos Auto or the D'Agostinos of any of the facts or violations alleged in the Complaint, upon consent of the Parties, and upon consideration of the mutual promises contained herein,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED as follows:

## I.    JURISDICTION AND VENUE

1.   Jurisdiction over this action is conferred by 28 U.S.C. § 1331 (federal question) and 33 U.S.C. § 1365(a) (Clean Water Act jurisdiction).  An actual, justiciable controversy exists between Plaintiff and Defendant. The requested relief is proper under 28 U.S.C. § 2201, 28 U.S.C. § 2202 and 33 U.S.C. § 1365(a).

2.   Venue is properly vested in this Court pursuant to 33 U.S.C. § 1365(c)(1), because the events giving rise to this action occurred at the D'Agostinos Auto facility, located at 1174 Douglas Avenue, North Providence, RI 02904, and in the Narragansett watershed, which are located within this judicial district.

## II.  COMPLIANCE PROGRAM

3.   D'Agostino's Auto will implement the attached Proposal to Provide Stormwater Design and Prepare RIDEM Permit Application for 1174 Douglas Avenue, North Providence, Rhode Island (the "Proposal") upon execution of this Consent Decree.

4.   Dolores R. D'Agostino and Ronald C. D'Agostino will provide financing up to $11,000 for tasks numbered 1, 2, 3 and 5 only as set out in the Proposal.  Dolores R. D'Agostino and Ronald C. D'Agostino shall be billed directly by the contractor for these services.

5.   Any changes to the Proposal will be in writing and shall result only from the request and/or order of the Rhode Island Department of Environmental Management ("RIDEM").

6.   In accordance with the Proposal, D'Agostinos Auto will install a monitoring well and conduct sampling at the well for the pollutants identified at Part VIII.M.5 of Rhode Island's Multi-Sector General Permit for Storm Water Discharge Associated with Industrial Activity ("MSGP").  The monitoring well shall be installed within two calendar weeks after construction of a treatment system consistent with both the Proposal and any permit issued by RIDEM to D'Agostinos Auto.  D'Agostinos Auto must begin its sampling activities within twelve months from the date the stormwater registration system is installed, and must conduct sampling at the well twice annually at intervals of no less than four months.  All such monitoring must take place on a Measurable Storm Event as set forth in MSGP Part VI.A.3.  In the event that the average of all samples' pollutant concentrations for two consecutive years are less than the Sector M benchmark concentrations set forth at MSGP Part VIII.M.5, no further monitoring or sampling shall be required under this Consent Decree.

7.   D'Agostinos Auto will share any monitoring results obtained as a result of the Proposal with CLF immediately upon receipt of such results, using the contact information set forth in paragraph [27] below.

### III.    SUPPLEMENTAL ENVIRONMENTAL PROJECT

8.   D'Agostino's Auto will donate one or more vehicles and/or automobiles to Save the Bay, a non-governmental organization located at 100 Save The Bay Dr, Providence, RI 02905, for use in Save the Bay's programmatic efforts to restore the Narragansett Bay and its watershed to health.  The donated vehicles' valuation, per current Kelly Blue Book information, or other customary industry standard, shall be equal to twenty thousand ($20,000) dollars, upon execution of this Consent Decree.

9.   With regard to the SEP, D'Agostinos Auto certifies the following:

a.   That D'Agostinos Auto in good faith estimates that the cost of implementing the SEP is $20,000, as determined by the Kelly Blue Book for any automobile donation included as part of the SEP and by applying D'Agostinos Auto's usual parts and labor charges for any in-kind automobile repair and maintenance included as part of the SEP;

   b.  That D'Agostinos Auto is not required to implement the SEP by any federal, state, or local law or regulation and is not required to implement the SEP by agreement, grant, or as injunctive relief awarded in any other action in any forum;

   c.  That the SEP is not a project that D'Agostinos Auto was planning or intending to construct, perform, or implement other than in settlement of the claims resolved in this Consent Decree;

   d.  That D'Agostinos Auto has not received and will not receive credit for the SEP in any other enforcement action; and

   e.  That D'Agostinos Auto will not receive any reimbursement for any portion of the SEP from any other person.

10. Upon completion of the SEP, D'Agostinos Auto shall submit a SEP Completion Report to CLF at the address specified in paragraph [27] below.  The SEP Completion Report shall contain the following information:

   a.  A detailed description of the SEP as implemented;

   b.  A description of any problems encountered in completing the SEP and the solutions thereto;

   c.  An itemized list of all SEP expenditures;

   d.  Certification that the SEP has been fully implemented according to the terms of this Consent Decree; and

   e.  A description of the environmental and public health benefits resulting from implementation of the SEP.

### IV.    LIQUIDATED ATTORNEY FEES AND COSTS

11. The D'Agostinos shall pay to CLF a sum of $20,000 as full and complete satisfaction of CLF's claim for attorneys' fees and costs incurred in this matter, which sum shall be paid according to the following schedule:

   a.  $10,000 by October 1, 2017;
   b.  $5,000 by October 1, 2018;
   c.  $3,000 by October 1, 2019;
   d.  $2,000 by October 1, 2020.

12. In the event that any payment owed by the D'Agostinos has not been paid within five days following the due date, the D'Agostinos shall immediately pay to CLF a late fee of Five Hundred ($500.00) Dollars and interest on the overdue amount, which amount shall include any unpaid late fee or fees, shall begin accruing at the statutory rate of 12%.

In the event that any payment owed by the D'Agostinos has not been paid within sixty days following the due date, the D'Agostinos shall immediately pay to CLF an additional late fee of One Thousand ($1,000.00) Dollars and statutory interest shall continue to accrue on the overdue amount, which amount shall include any unpaid late fee or fees.  In the event that any payment owed by the D'Agostinos has not been paid within one hundred eighty days following the due date, the D'Agostinos shall immediately pay to CLF an additional late fee of Five Thousand ($5,000) Dollars and statutory interest shall continue to accrue on the overdue amount, which amount shall include any unpaid late fee or fees.  For purposes of this paragraph, a payment shall be deemed made on the day it is postmarked, provided that the payment is addressed to CLF in the manner set forth in paragraph [27] below.

## V.    EFFECT OF DECREE

13. CLF covenants not to sue and releases D'Agostinos Auto (and its parent corporations, subsidiaries, officers, directors, shareholders, employees, agents, and consultants) and Dolores R. D'Agostino and Ronald C. D'Agostino from any and all claims, causes of action, or liability under Section 505 of the Clean Water Act, 33 U.S.C. § 1365 for damages, penalties, fines, injunctive relief, or any other claim or relief (i) relating to or resulting from noncompliance with Rhode Island's Multi-Sector General Permit ("MSGP") for Storm Water Discharge Associated with Industrial Activity at the Facility occurring prior to the date the Court enters this Decree or (ii) for any past violations alleged in the Complaint, and any violations that could have been alleged therein.

14. CLF covenants not to sue and releases Dolores R. D'Agostino and Ronald C. D'Agostino from any and all claims, causes of action, or liability under Section 505 of the Clean Water Act, 33 U.S.C. § 1365 for damages, penalties, fines, injunctive relief, or any other claim or relief (i) relating to or resulting from noncompliance with the MSGP at the Facility occurring prior to the date the Court enters this Decree or (ii) for any past violations alleged in the Complaint.

15. D'Agostinos Auto and Dolores C. D'Agostino and Ronald C. D'Agostino covenant not to sue and release CLF, its representatives, assigns, agents, employees, officers, and attorneys, including those who have held positions in the past from any and all claims, liability, demands, penalties, costs, and causes of action of every nature which concern with this action.

16. D'Agostino's Auto covenants not to sue and releases Dolores R. D'Agostino and Ronald C. D'Agostino from any and all claims, causes of action, or liability as alleged in the underlying complaint.

17.  Neither this Decree, nor terms thereof, nor performance of the terms thereunder by D'Agostinos Auto shall constitute or be construed as an admission or acknowledgment by D'Agostinos Auto of the factual or legal assertions contained in this Decree or in CLF's Complaint, and D'Agostinos Auto and Dolores R. D'Agostino and Ronald C. D'Agostino retain the right to controvert in any subsequent proceedings the validity of the facts or determinations contained in this Decree or the Complaint, except

that D'Agostinos Auto, Dolores R. D'Agostino, and Ronald C. D'Agostino shall not retain the right to controvert the terms of this Decree in any proceedings for the purpose of implementing or enforcing this Decree. Neither this Decree, nor terms thereof, nor performance of the terms thereunder, shall constitute or be construed as an admission or acknowledgment by D'Agostinos Auto of any liability, or an admission of violation of any law, by D'Agostinos Auto or by its officers, directors, employees, agents, successors, or assigns.

18. CLF does not, by consent to the Decree, warrant or aver in any manner that D'Agostinos Auto's compliance with this Decree will constitute or result in compliance with federal or state law or regulation. Nothing in this Decree shall be construed to affect or limit in any way the obligation of D'Agostinos Auto to comply with all federal, state, and local laws and regulations governing any activity required by this Decree.

19. Dolores R. D'Agostino and Ronald C. D'Agostino's financial obligation under this Consent Decree consists of:

    a.  making a total payment of $20,000 for attorney's fees as set out in Section IV, paragraph 11, in this Consent Decree and making payments directly to the contractor in an amount not to exceed $11,000 as set out in paragraph 4 of this Consent Decree and the Proposal under the heading "Task". Total payments not to exceed $31,000.

    b.  payment of these funds mentioned in subparagraph (a) shall satisfy the obligations of Dolores R. D'Agostino and Ronald C. D'Agostino with respect to this Consent Decree and the Proposal.

## VI.    REVIEW AND TERM OF DECREE

20. The Parties recognize that, pursuant to 33 U.S.C. § 1365(c)(3), this Consent Decree cannot be entered until forty-five (45) days after the receipt of a copy of the proposed Consent Decree by the United States Attorney General and the EPA. Therefore, upon signing of this decree by the Parties, CLF shall serve copies of this Decree upon the EPA Administrator, the Regional EPA Administrator, and the Attorney General for review, as required by 40 C.F.R. § 135.5.

21. Upon the expiration of the forty-five-day review period provided by 33 U.S.C. § 1365(c)(3), the Parties will jointly move the Court for entry of this Decree. This Decree shall take effect on the date it is entered by this Court and shall terminate five (5) years from when it is entered by the Court. If for any reason the Court should decline to approve this Decree in the form presented, the Parties agree to continue negotiations in good faith in an attempt to cure any objection raised by the Court to entry of this Decree.

## VII.    MODIFICATION AND ENFORCEMENT OF DECREE

22. This Decree may be modified only upon written consent of the Parties and the approval of the Court.

23. This Court shall retain jurisdiction over this matter and allow this action to be reopened for the purpose of enabling the Parties to this Decree to apply to the Court for any further order that may be necessary to construe, carry out, enforce compliance and/or resolve any dispute regarding the terms or conditions of this Decree.

## VIII.   MISCELLANEOUS PROVISIONS

24.  With the exception of section II ("Compliance Program"), this Decree shall remain in effect if D'Agostinos Auto relocates the Facility to a different location.

25. All payments pursuant to this Decree shall be made in form of a certified bank check.

26. Entire Agreement. This Decree constitutes the entire agreement among the Parties concerning the subject matter hereof and supersedes all previous correspondence, communications, agreements and understandings, whether oral or written, among the Parties.

27. Notices. Any notice, demand, copies of documents and other communications required to be made under the provisions of this Decree (collectively, "Notices") by any Party hereto shall be effective only if in writing and (a) emailed, (b) personally served, (c) mailed by United States registered or certified mail, return receipt requested, postage prepaid, or (d) sent by a nationally recognized courier service (i.e., Federal Express) for next-day delivery, to be confirmed in writing by such courier.  Notices shall be directed to the Parties at their respective addresses set forth below. Notices given in the foregoing manner shall be deemed given when (a) sent via email, (b) actually received or refused by the party to whom sent if delivered by courier, or (c) if mailed, on the day of actual delivery as shown by the addressee's registered or certified mail receipt or at the expiration of three (3) business days after the date of mailing, whichever first occurs.

Notices for Plaintiff shall be sent to:

Max Greene, Esq.
Conservation Law Foundation
55 Dorrance Street
Providence, RI 02903
mgreene@clf.org
Attorney for CLF

Notice for D'Agostinos Auto shall be sent to:

Marisa Desautel, Esq.
Law Office of Marisa Desautel, LLC
55 Pine St., 4th Floor
Providence, RI 02903
marisa@desautelesq.com

Notice for the D'Agostinos shall be sent to:

Stephen C. Mackie, Esq.
Mackie & Reilly
681 Smith Street
Providence, RI 02908
Law681@aol.com

Each Party shall promptly notify the other Party of any change in the above-listed contact information by using the procedures set forth on this paragraph.

28. Authorization.  Each person signing this Decree represents and warrants that s/he has been duly authorized to enter into this Decree by the Party on whose behalf it is indicated that the person is signing.

29. Successors and Assigns.  This Decree shall be binding upon and inure to the benefit of the Parties and their respective representatives, heirs, executors, administrators, successors, officers, directors, agents, attorneys, employees and permitted assigns.

30. Interpretation.  The provisions contained herein shall not be construed in favor of or against any Party because that party or its counsel drafted this Decree, but shall be construed as if all Parties prepared this Decree, and any rules of construction to the contrary are hereby specifically waived.  The terms of this Decree were negotiated at arm's length by the Parties hereto.

31. Headings. The section and paragraph headings contained in this Decree are for reference purposes only and shall not affect in any way the meaning or interpretation of this Decree.

32. Counterparts.  Facsimile, electronic and scanned signatures shall be deemed to be originals for all purposes.  Copies of the original Agreement, whether transmitted by facsimile or other means, shall be effective.  This Agreement may be signed in counterparts.

33. Severability.  In the event that any of the provisions of this Decree are held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

[SIGNATURE PAGE FOLLOWS]

CONSERVATION LAW FOUNDATION, INC.

By: _____  Date:_____
     Christopher M. Kilian, VP and Director
     Conservation Law Foundation
     15 East State Street, Suite 4
     Montpelier, VT 05602
     (802) 223-5992 x4011
     ckilian@clf.org


D'AGOSTINOS AUTO SALES & SALVAGE, INC.

By: _____  Date:_____
     Elias Ayoub
     President, D'Agostino's Auto Sales & Salvage, Inc.
     1174 Douglas Avenue
     North Providence, RI 02904


DOLORES R. D'AGOSTINO and RONALD C. D'AGOSTINO

By: _____  Date:_____
     DOLORES R. D'AGOSTINO


By: _____  Date:_____
     RONALD C. D'AGOSTINO


ENTERED and DATED this _____ day of _____, 2017

     _____
     Honorable John J. McConnell, Jr.
     United States District Judge

CONSERVATION LAW FOUNDATION, INC.

By: _____    Date: 7/31/17

Christopher M. Kilian, VP and Director
Conservation Law Foundation
15 East State Street, Suite 4
Montpelier, VT 05602
(802) 223-5992 x4011
ckilian@clf.org


D'AGOSTINOS AUTO SALES & SALVAGE, INC.

By: _____    Date:_____

Elias Ayoub
President, D'Agostino's Auto Sales & Salvage, Inc.
1174 Douglas Avenue
North Providence, RI 02904


DOLORES R. D'AGOSTINO and RONALD C. D'AGOSTINO

By: _____    Date:_____
DOLORES R. D'AGOSTINO


By: _____    Date:_____
RONALD C. D'AGOSTINO


ENTERED and DATED this _____ day of _____, 2017

_____
Honorable John J. McConnell, Jr.
United States District Judge

Case 1:15-cv-00230-JJM-PAS    Document 17    Filed 10/13/17    Page 11 of 21 PageID #:
Case 1:15-cv-00230-JJM-PAS    Document 16-1    Filed 08/25/17   Page 11 of 21 PageID #: 143
164

CONSERVATION LAW FOUNDATION, INC.

By: _____    Date:_____
      Christopher M. Kilian, VP and Director
      Conservation Law Foundation
      15 East State Street, Suite 4
      Montpelier, VT 05602
      (802) 223-5992 x4011
      ckilian@clf.org


D'AGOSTINOS AUTO SALES & SALVAGE, INC.

By: _____    Date: 7/31/17
      Elias Ayoub
      President, D'Agostino's Auto Sales & Salvage, Inc.
      1174 Douglas Avenue
      North Providence, RI 02904


DOLORES R. D'AGOSTINO and RONALD C. D'AGOSTINO

By: _____    Date:_____
      DOLORES R. D'AGOSTINO


By: _____    Date:_____
      RONALD C. D'AGOSTINO


ENTERED and DATED this _____ day of _____, 2017

                    _____
                    Honorable John J. McConnell, Jr.
                    United States District Judge

Scanned by CamScanner

CONSERVATION LAW FOUNDATION, INC.

By: _____    Date:_____
        Christopher M. Kilian, VP and Director
        Conservation Law Foundation
        15 East State Street, Suite 4
        Montpelier, VT 05602
        (802) 223-5992 x4011
        ckilian@clf.org


D'AGOSTINOS AUTO SALES & SALVAGE, INC.

By: _____    Date:_____
        Elias Ayoub
        President, D'Agostino's Auto Sales & Salvage, Inc.
        1174 Douglas Avenue
        North Providence, RI 02904



DOLORES R. D'AGOSTINO and RONALD C. D'AGOSTINO

By: _____    Date: 8-25-17
        DOLORES R. D'AGOSTINO


By: _____    Date: 8-25-17
        RONALD C. D'AGOSTINO


ENTERED and DATED this 12th day of October, 2017

                    _____
                    Honorable John J. McConnell, Jr.
                    United States District Judge

                                            10/13/17



July 18, 2017

Mr. Elias Ayoub, President
D'Agostino's Auto Sales & Salvage, Inc.
1174 Douglas Avenue
North Providence, RI 02904

Delores & Ronald D'Agostino
400 Narraganset Parkway, NB 5
Warwick, RI 02888

**RE:    Revised Proposal to Provide Stormwater Design, Prepare RIDEM Permit
Application and Sample Groundwater for 1174 Douglas Avenue, North Providence,
Rhode Island**

Dear Mr. Ayoub and Mr. & Mrs. D'Agostino:

Amec Foster Wheeler Environment and Infrastructure, Inc. (Amec Foster Wheeler) is pleased to
provide this revised proposal for stormwater design and RIDEM permit application preparation
for 1174 Douglas Avenue, North Providence, Rhode Island.  This work will be completed under
the direction of Attorney Marisa Desautel.  The following sections describe our proposed scope
of work, cost, and contractual conditions for providing these services.

## Scope of Work
Under the direction of Attorney Desautel, Amec Foster Wheeler will provide the following:

1. Test Pit Observation

   A Project Engineer will be present at the site for no more than four (4) hours to observe
   test pits to be conducted by others. If feasible, test pits should be excavated to a depth
   into naturally occurring soil (below any organic or fill layers) to make a visual observation
   of potential groundwater depth and soil category (sand, gravel, silt, etc.) and, based on
   this visual observation, provide an estimate of soil type/likely permeability rate and depth
   to seasonal high groundwater table for use in drainage calculations to be performed
   under other tasks.

   **NOTE:** This assessment is only to estimate the soil conditions and is not intended to
   replace a definitive soil category and depth to seasonal high groundwater table, as
   would be ascertained by a licensed Class IV Soil Evaluator. If reasonable indicators or
   soil type and groundwater indicators are not present, we recommend engaging a soil
   evaluator or geotechnical engineer for additional testing.

2. Engineering Services

   A "Stormwater Management Plan," a "Soil Erosion and Sediment Control Plan," and an
   "Operation and Maintenance Plan" will be prepared per the "Supporting Information"
   requirements on Page 2 of 2 of the RIDEM "Stormwater Discharge System Registration
   (SDSR)" application.  Scope of Work includes the following:

Proposal to Provide Stormwater Design and Regulatory Coordination Services
July 18, 2017
Page 2

> ▸ Conduct drainage calculations for the 1-year and 100-year storm events to determine the estimated time to drain the paved areas, based on the existing pervious area of stone and the estimated infiltration rate to achieve a drain time of less than 12 hours for the one-year storm and less than 72 hours for the 100-year storm event. If additional pervious area is required to meet these drain times, we will notify the Client of the required additional stone area prior to advancing plans and documents.

> ▸ Prepare a site plan, using the RELCO plan as a base, and updating this plan with additional details to show the existing/proposed stormwater infiltration area and required soil erosion and sedimentation control measures during construction.

> ▸ Prepare three reports to support the SDSR application: "Drainage Study," "Soil Erosion and Sediment Control Plan," and "Operation and Maintenance Plan".

> **NOTE:** Per Attorney Desautel, Amec Foster Wheeler understands that these plans and reports shall be a "pared-down" version of the level of documentation normally required by RIDEM; therefore, we have allocated 40 hours of a project engineer's time to this task.  Responses to RIDEM comments are included in the task below.

> ▸ Compile and submit the application to RIDEM.

> <u>Products</u>: Drainage Memorandum, Stormwater Management Plan, and reports to support the RIDEM Stormwater Discharge System Registration (SDSR) application

3. Install One (1) Groundwater Monitoring Well

Amec Foster Wheeler will observe the installation of one (1) groundwater monitoring well at the property to monitor groundwater following installation of stormwater improvements.  The monitoring well will be installed via Geoprobe Direct Push Technology to a depth of 15 feet below ground surface and protected via metal standpipe.

4. Groundwater Sampling & Analysis

Amec Foster Wheeler will develop, purge and sample the newly installed groundwater monitoring well at the direction of Attorney Desautel for two (2) monitoring events. Groundwater samples will be delivered to ESS Laboratory in Cranston, Rhode Island and analyzed for Total Suspended Solids, Total Aluminum, Total Iron and Total Lead. Following receipt of analytical results, a monitoring report will be prepared summarizing the field activities and documenting analytical results.

5. Regulatory and Project Coordination

Amec Foster Wheeler will attend coordination meetings, respond to RIDEM comments, and participate in conference calls with the Client and associated team members to support this effort.  It is expected that several meetings will be required, particularly between the Client and attorney.  In addition, we will coordinate with and attend any meetings with RIDEM during the process, as required.  20 hours of Project Engineer's time over the duration of the permitting process is estimated for this task; additional time, if necessary, will be billed on an hourly basis.

## Project Team

Ms. Chris Beaulieu-Shea, PE and her engineering team will provide all required engineering and regulatory coordination services, as described above.

Case 1:15-cv-00230-JJM-PAS    Document 17    Filed 10/13/17    Page 15 of 21 PageID #:
168
Case 1:15-cv-00230-JJM-PAS    Document 16    Filed 08/25/17    Page 15 of 21 PageID #: 147

Proposal to Provide Stormwater Design and Regulatory Coordination Services
July 18, 2017
Page 3

## Estimated Costs

Amec Foster Wheeler will perform the services outlined in this proposal for an estimated fee, as shown below, including project expenses, travel, materials, and supplies. ***A professional retainer of $11,000.00 is required prior to initiating work on this project.*** Amec Foster Wheeler shall invoice monthly on a percentage of completion basis and invoices are due and payable within 30 days.

| Task | Cost |
|------|------|
| 1.0 Test Pit Observation | $700.00 |
| 2.0 Engineering Services | $6,000.00 |
| 3.0 Install One (1) Groundwater Monitoring Well | $1,000.00 |
| 4.0 Groundwater Sampling & Analysis | $4,000.00 |
| 5.0 Regulatory and Project Coordination | $3,300.00 |
| **Total** | **$15,000.00** |

## Schedule

Amec Foster Wheeler can commence work immediately after receiving written authorization and the professional retainer from D'Agostino's Auto Sales & Salvage, Inc. and Delores & Ronald D'Agostino.

## Authorization

The scope of work will be performed under the attached contract terms and conditions between D'Agostino's Auto Sales & Salvage, Inc., Delores & Ronald D'Agostino and Amec Foster Wheeler. We appreciate the opportunity to propose professional services and look forward to working with you on this project. If you have any questions, please contact Chris Beaulieu-Shea at (401) 648-9242.

Respectfully submitted,

**Amec Foster Wheeler Environment & Infrastructure, Inc.**

Timothy Regan, PE
Client Manager/Principal Engineer



# Attachment A
## Terms and Conditions

Case 1:15-cv-00230-JJM-PAS    Document 17    Filed 10/13/17    Page 17 of 21 PageID #:
170
Case 1:15-cv-00230-JJM-PAS    Document 16-1    Filed 08/25/17    Page 17 of 21 PageID #: 149



amec
foster
wheeler

# SERVICES AGREEMENT
### (Firm Fixed Price)

THIS AGREEMENT (the "Agreement"), effective this 18th day of July 2017, is made by and between Amec Foster Wheeler Environment & Infrastructure, Inc., a Nevada corporation, with an address at 275 Promenade Street, Providence, RI 02908 ("Amec Foster Wheeler") and D'Agostino's Auto Sales & Salvage, Inc., a Rhode Island corporation, with an address at 1174 Douglas Avenue, North Providence, RI 02904 and Delores and Ronald D'Agostino, with an address of 400 Narragansett Parkway, NB 5, Warwick, RI 02888 ("CLIENT").

NOW, THEREFORE, in consideration of the mutual undertakings and subject to the terms set forth below and intending to be legally bound, the parties agree as follows:

**1. SCOPE OF SERVICES:** This Agreement sets forth the terms and conditions pursuant to which Amec Foster Wheeler will provide CLIENT services (the "Services") as described in its proposal, dated July 18, 2017 ("Proposal").

**2. COMPENSATION:** Amec Foster Wheeler will be compensated in US dollars for its Services on a fixed-price basis.

Except to the extent that Amec Foster Wheeler has agreed otherwise, CLIENT assumes full responsibility for the payment of any applicable sales, use, or value-added taxes under this Agreement. If Services are required to be provided in any foreign jurisdiction (i.e. – outside the US), CLIENT shall compensate Amec Foster Wheeler for any and all additional taxes, penalties, duties, levies or other charges by any governmental authority assessed or imposed in relation to this Agreement or the Services or any part thereof, which exceed those imposed in the US and whether assessed or imposed on Amec Foster Wheeler, its employees, its subcontractors or otherwise.

Invoices will be submitted at least monthly for Services rendered. Terms of payment are net thirty (30) days from date of invoice with a one and one-half percent (1.5%) per month late fee on balances past due. Interest shall be computed at 31 days from the date of invoice. In addition, any collection fees, attorneys' fees, court costs, and other related expenses incurred by Amec Foster Wheeler in the collection of delinquent invoice amounts shall be paid by CLIENT.

Payment will be made to Amec Foster Wheeler at the address specified on Amec Foster Wheeler's invoice.

If CLIENT reasonably objects to all or any portion of an invoice, CLIENT shall notify Amec Foster Wheeler of that fact in writing within ten (10) days from the date of receipt of Amec Foster Wheeler's invoice, give reasons for the objection, and pay that portion of the invoice not reasonably in dispute. Failure of CLIENT to provide such written notice within the allowed ten (10) day period shall be deemed to be a waiver of all objections to that invoice.

CLIENT's payment shall represent CLIENT's acceptance of the Services invoiced by Amec Foster Wheeler. Amec Foster Wheeler may suspend performance of Services under this Agreement if: (i) CLIENT fails to make payment in accordance with the terms hereof, or (ii) Amec Foster Wheeler reasonably believes that CLIENT will be unable to pay Amec Foster Wheeler in accordance with the terms hereof and notifies CLIENT in writing prior to such suspension of Services. Such suspension shall continue until Amec Foster Wheeler has been paid in full for all balances past due including applicable service charges and CLIENT provides Amec Foster Wheeler with adequate assurance of CLIENT's ability to make future payments in accordance with the terms hereof. If any such suspension causes an increase in the time required for the performance of any part of the Services, the performance schedule and/or period for performance shall be extended for a period of time equal to the suspension period.

**3. STANDARD OF CARE:** Amec Foster Wheeler will perform the Scope of Services specified utilizing that degree of skill and care ordinarily exercised under similar conditions by reputable members of Amec Foster Wheeler's profession practicing in the same or similar locality at the time of performance. NO OTHER WARRANTY, GUARANTY, OR REPRESENTATION, EXPRESS OR IMPLIED, IS MADE OR INTENDED IN THIS AGREEMENT, OR IN ANY COMMUNICATION (ORAL OR WRITTEN), REPORT, OPINION, DOCUMENT, OR INSTRUMENT OF SERVICE, AND THE SAME ARE SPECIFICALLY DISCLAIMED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

**4. INDEPENDENT CONTRACTOR:** Amec Foster Wheeler shall be fully independent and shall not act, except as permitted herein, as an agent or employee of CLIENT. Amec Foster Wheeler shall be solely responsible for its employees and for their compensation, benefits, contributions, and taxes, if any.

Unless otherwise agreed to in writing by Amec Foster Wheeler and CLIENT, neither party shall directly or indirectly solicit, hire or retain, or knowingly cause a third party to solicit, hire or retain, during the term of this Agreement and for a period of one (1) year after the date on which this Agreement terminates, any employee of the other party who works on the

US FFP 1-2015

preparation of the Proposal or otherwise performs Services under or in connection with this Agreement. Nothing herein shall prevent either party from hiring any individual who responds to a general advertisement for services.

**5. INSURANCE:** Amec Foster Wheeler will maintain insurance for this Agreement in the following types and limits: (i) worker's compensation insurance as required by applicable law, (ii) comprehensive general liability insurance (CGL) ($1,000,000 per occurrence / $2,000,000 aggregate), and (iii) automobile liability insurance for bodily injury and property damage ($1,000,000 CSL).

**6. CHANGES:** CLIENT may order changes within the general scope of the Services by altering, adding to, or deleting from the Services to be performed. Work beyond the scope of services or re-doing any part of the project through no fault of Amec Foster Wheeler, shall constitute extra work and shall be paid for on a time-and-materials basis in addition to any other payment provided for in this Agreement.

Should Amec Foster Wheeler encounter conditions which were (i) not reasonably anticipated, including, but not limited to, changes in applicable law,  (ii) subsurface or otherwise concealed physical conditions that differ materially from those indicated in this Agreement or (iii) unknown physical conditions of an unusual nature that differ materially from those ordinarily found to exist and generally recognized as inherent in activities of the character contemplated by this Agreement, Amec Foster Wheeler shall promptly provide notice to CLIENT. CLIENT shall promptly investigate such conditions.  If, in Amec Foster Wheeler's reasonable opinion, the conditions cause an increase or decrease in Amec Foster Wheeler's cost of, or time required for, performance of any part of its Services, CLIENT shall issue a Change Order with an equitable adjustment in Amec Foster Wheeler's compensation, schedule, or both. In the event no Change Order is agreed to, Amec Foster Wheeler reserves the right to either (i) suspend its performance until a Change Order is agreed to or (ii) discontinue its performance and terminate this Agreement.

**7. FORCE MAJEURE:** Should performance of Services by Amec Foster Wheeler be affected by causes beyond its reasonable control, Force Majeure results. Force Majeure includes, but is not restricted to: acts of God; acts of a legislative, administrative or judicial entity; acts of contractors other than contractors engaged directly by Amec Foster Wheeler; earthquakes; fires; floods; labor disturbances; epidemics; and unusually severe weather. Amec Foster Wheeler will be granted a time extension and the parties will negotiate an equitable adjustment to the price of any affected Services, where appropriate, based upon the effect of the Force Majeure on performance by Amec Foster Wheeler.

**8. INSTRUMENTS OF SERVICE:** All reports, drawings, plans, or other documents (or copies) furnished to Amec Foster Wheeler by the CLIENT, shall at CLIENT's written request, be returned upon completion of the Services hereunder; provided, however, that Amec Foster Wheeler may retain one (1) copy of all such documents  All reports, drawings, plans, documents, software, source code, object code, field notes and work product (or copies thereof) in any form prepared or furnished by Amec Foster Wheeler under this Agreement are instruments of service. Exclusive ownership, copyright and title to all instruments of service remain with Amec Foster Wheeler.

CLIENT agrees as follows: (i) the instruments of service (a) may be used and relied upon only by CLIENT and, subject to the terms of  this Agreement, its design team solely for the design of the Project, (b) will not be used other than for the Project, but may be submitted for any necessary regulatory approval, (c) may be based in part or in whole on facts and/or assumptions provided to, but not independently verified by, Amec Foster Wheeler and (d) will reflect Amec Foster Wheeler's findings as to conditions that existed only at the time the Services were performed; (ii) Amec Foster Wheeler (a) makes no representations as to any facts or assumptions provided to, but not independently verified by, Amec Foster Wheeler and (b) may rely on all of the information and data provided by CLIENT to Amec Foster Wheeler being accurate and complete; (iii) any third party who wishes to rely on any instruments of service must first sign Amec Foster Wheeler's Reliance Letter Agreement; and (iv) if CLIENT requests instruments of service on electronic media, the electronic copy may be inaccurate or incomplete and the document retained by Amec Foster Wheeler will be the official document, and any modification(s) of the electronic copy made by CLIENT will be at its own risk. CLIENT hereby releases, defends, indemnifies, and holds harmless Amec Foster Wheeler from and against all liabilities asserted against, or incurred by, Amec Foster Wheeler related to the breach by CLIENT of any of the foregoing agreements; provided, if CLIENT is a governmental entity, it has no obligation to defend or indemnify Amec Foster Wheeler.

**9. CLIENT'S RESPONSIBILITIES:** CLIENT agrees to: (i) provide Amec Foster Wheeler all available material, data, and information pertaining to the Services, including, without limitation, plot plans, topographic studies, hydrologic data and previous soil and geologic data including borings, field or laboratory tests, written reports, the composition, quantity, toxicity, or potentially hazardous properties of any material known or believed to be present at any site, any hazards that may be present, the nature and location of underground or otherwise not readily apparent utilities, summaries and assessments of the site's past and present compliance status, and the status of any filed or pending judicial or administrative action concerning the site and shall immediately transmit to Amec Foster Wheeler any new information that becomes available or any changes in plans; (ii) convey and discuss such materials, data, and information with Amec Foster Wheeler; and (iii) ensure cooperation of CLIENT's employees.

CLIENT shall indemnify, defend, and save Amec Foster Wheeler harmless from and against any liability, claim, judgment, demand, or cause of action arising out of or relating to: (i) CLIENT's breach of this Agreement; (ii) the negligent acts or omissions of CLIENT or its employees, contractors, or agents; (iii) any allegation that Amec Foster Wheeler is the owner or

US FFP 1-2015

operator of a site, or arranged for the treatment, transportation or disposal of hazardous materials, including all adverse health effects thereof and (iv) site access or damages to any subterranean structures or any damage required for site access.

In addition, where the Services include preparation of plans and specifications and/or construction oversight activities for CLIENT, CLIENT agrees to have its construction contractors agree in writing to indemnify and save harmless Amec Foster Wheeler from and against loss, damage, injury, or liability attributable to personal injury or property damage arising out of or resulting from such contractors' performance or nonperformance of their work.

**10. SITE ACCESS:** CLIENT shall at its cost and at such times as may be required by Amec Foster Wheeler for the successful and timely completion of Services: (i) provide unimpeded and timely access to any site, including third party sites if required (ii) provide an adequate area for Amec Foster Wheeler's site office facilities, equipment storage, and employee parking; (iii) furnish all construction utilities and utilities releases necessary for the Services; (iv) provide the locations of all subsurface structures, including piping, tanks, cables, and utilities; (v) approve all locations for digging and drilling operations; and (vi) obtain all permits and licenses which are necessary and required to be taken out in CLIENT's name for the Services. Amec Foster Wheeler will not be liable for damage or injury arising from damage to subsurface structures that are not called to its attention and correctly shown on the plans furnished to Amec Foster Wheeler in connection with its work.

**11. WARRANTY OF TITLE, WASTE OWNERSHIP:** CLIENT has and shall retain all responsibility and liability for the environmental conditions on the site. Title and risk of loss with respect to all materials shall remain with CLIENT  If the samples or wastes resulting from the Services contain any contaminants, Amec Foster Wheeler, as the CLIENT's agent, and at CLIENT's direction and expense, will either (i) return such samples or wastes to, or leave them with, CLIENT for appropriate disposal or (ii) using a manifest signed by CLIENT as generator and arranger, coordinate the transport of such samples or wastes to an approved facility selected by CLIENT for final disposal, using a transporter selected by CLIENT.  At no time will Amec Foster Wheeler assume possession or title, constructive or express, to any such samples or wastes. CLIENT agrees to pay all costs associated with the storage, transport, and disposal of samples and wastes.

**12. LIMITATION OF LIABILITY: As part of the consideration Amec Foster Wheeler requires for provision of the Services indicated herein, CLIENT agrees that any claim for damages filed against Amec Foster Wheeler by CLIENT or any contractor or subcontractor hired directly or indirectly by CLIENT will be filed solely against Amec Foster Wheeler or its successors or assigns and that no individual person shall be made personally liable for damages, in whole or in part.**

**CLIENT's sole and exclusive remedy for any alleged breach of Amec Foster Wheeler's standard of care hereunder shall be to require Amec Foster Wheeler to re-perform any defective Services. All claims by CLIENT shall be deemed relinquished unless filed within one (1) year after substantial completion of the Services.**

**TO THE MAXIMUM EXTENT PERMITTED BY LAW, CLIENT AGREES THAT THE LIABILITY OF AMEC FOSTER WHEELER TO CLIENT FOR ANY AND ALL CAUSES OF ACTION, INCLUDING, WITHOUT LIMITATION, CONTRIBUTION, ASSERTED BY CLIENT AND ARISING OUT OF OR RELATED TO THE NEGLIGENT ACT(S), ERROR(S) OR OMISSION(S) OF AMEC FOSTER WHEELER IN PERFORMING SERVICES, SHALL BE LIMITED TO FIFTY THOUSAND DOLLARS ($50,000) OR THE TOTAL FEES ACTUALLY PAID TO AMEC FOSTER WHEELER BY CLIENT UNDER THIS AGREEMENT WITHIN THE PRIOR ONE (1) YEAR PERIOD, WHICHEVER IS LESS ("LIMITATION").  CLIENT HEREBY WAIVES AND RELEASES (I) ALL PRESENT AND FUTURE CLAIMS AGAINST AMEC FOSTER WHEELER OTHER THAN THOSE DESCRIBED IN THE PRECEDING SENTENCE, AND (II) ANY LIABILITY OF AMEC FOSTER WHEELER IN EXCESS OF THE LIMITATION.**

**In consideration of the promises contained herein and for other separate, valuable consideration, the receipt and sufficiency of which are hereby acknowledged, CLIENT acknowledges and agrees that (i) but for the Limitation, Amec Foster Wheeler would not have performed the Services, (ii) it has had the opportunity to negotiate the terms of the Limitation as part of an "arms-length" transaction, (iii) the Limitation amount may differ from the amount of professional liability insurance carried by Amec Foster Wheeler, (iv) the Limitation is merely a limitation of, and not an exculpation from, Amec Foster Wheeler's liability and does not in any way obligate CLIENT to defend, indemnify or hold harmless Amec Foster Wheeler, (v) the Limitation is an agreed remedy, and (vi) the Limitation amount is neither nominal nor a disincentive to Amec Foster Wheeler performing the Services in accordance with the Standard of Care.**

**Amec Foster Wheeler and CLIENT shall each waive any right to recover from the other party for any special, incidental, indirect, or consequential damages (including lost profits and loss of use) incurred by either Amec Foster Wheeler or CLIENT or for which either party may be liable to any third party, which damages have been or are occasioned by Services performed or reports prepared or other work performed hereunder.**

**CLIENT agrees that the damages for which Amec Foster Wheeler shall be liable are limited to that proportion of such damages which is attributable to Amec Foster Wheeler's percentage of fault subject to the other limitations herein.**

**13. ASSIGNMENT AND SUBCONTRACTING:** Neither party shall assign its interest in this Agreement without the written consent of the other, except that Amec Foster Wheeler may assign its interest in the Agreement to related or affiliated

US FFP 1-2015

companies of Amec Foster Wheeler or subcontract portions of the Services to a qualified subcontractor without the consent of CLIENT.

If services are required in New York, Amec Foster Wheeler will arrange for such services to be provided by an associated firm and this agreement, where required, shall be deemed to be directly between the CLIENT and the licensed firm for all purposes related to the specific scope of services.  Amec Foster Wheeler shall retain responsibility in accordance with this Agreement for all services performed.

**14.  COST ESTIMATES:** If included in the Services, Amec Foster Wheeler will provide cost estimates based upon Amec Foster Wheeler's experience on similar projects, which are not intended for use by CLIENT or any other party in developing firm budgets or financial models, or in making investment decisions. Such cost estimates represent only Amec Foster Wheeler's judgment as a professional and, if furnished, are only for CLIENT's general guidance and are not guaranteed as to accuracy.

**15. DISPUTE RESOLUTION:** If a claim, dispute, or controversy arises out of or relates to the interpretation, application, enforcement, or performance of Services under this Agreement, Amec Foster Wheeler and CLIENT agree first to try in good faith to settle the dispute by negotiations between senior management of Amec Foster Wheeler and CLIENT. If such negotiations are unsuccessful, Amec Foster Wheeler and CLIENT agree to attempt to settle the dispute by good faith mediation if both parties agree. If the dispute cannot be settled though mediation, and unless otherwise mutually agreed, the dispute shall be settled by litigation in an appropriate court in the state of the Amec Foster Wheeler office entering into this Agreement. TO THE EXTENT NOT PROHIBITED BY LAW, THE PARTIES HEREBY WAIVE TRIAL BY JURY WITH RESPECT TO ANY ACTION OR PROCEEDING BROUGHT IN CONNECTION WITH THIS AGREEMENT. Except as otherwise provided herein, each party shall be responsible for its own legal costs and attorneys' fees.

**16.  TERM AND TERMINATION:** The term of this Agreement shall commence as of the day and year first written above, and shall continue in effect until terminated by either party as provided herein. Either party may terminate this Agreement at any time, with or without cause, by providing not less than ten (10) days advance written notice to the other party. Amec Foster Wheeler may terminate this Agreement immediately in writing if CLIENT becomes insolvent, enters bankruptcy, receivership, or other like proceeding (voluntary or involuntary) or makes an assignment for the benefit of creditors.

Notwithstanding the termination of this Agreement, this Agreement will survive as to the Services provided prior to the Agreement's effective termination date, until all of the rights and obligations of both parties thereunder have been fulfilled.

CLIENT shall compensate Amec Foster Wheeler for all Services performed hereunder through the date of any termination and all reasonable costs and expenses incurred by Amec Foster Wheeler in effecting the termination, including non-cancelable commitments and demobilization costs.

**17. NOTICE:** Any notice required under this Agreement will be in writing, addressed to the appropriate party at the address set forth in the introductory paragraph of this Agreement (or such other address as the parties may designate from time to time in writing) and given personally, by registered or certified mail postage prepaid, or by a commercial courier service. Notices shall be effective: (a) upon receipt after being delivered personally, (b) 3 days after being deposited in the mail as described above, or (c) 2 days after being deposited with a commercial courier service.

**18. CONFIDENTIALITY:** Both parties shall keep all information and data provided by the other party pertaining to the Services strictly confidential, and unless such information and data is already in the public domain on the date of the Agreement, neither party shall publish or otherwise disseminate such information and data to any third party without receiving written permission to do so from the source of such information or data. If disclosure of such confidential information is required by law or legal process, the party obligated to disclose such information should provide reasonable advance notice to the party that provided such information.

**19. WAIVER:** The failure of either Amec Foster Wheeler or CLIENT in any one or more instances to enforce one or more of the terms or conditions of this Agreement or to exercise any right or privilege in this Agreement or the waiver by Amec Foster Wheeler or CLIENT of any breach of the terms or conditions of this Agreement shall not be construed as thereafter waiving any such terms, conditions, rights, or privileges, and the same shall continue and remain in force and effect as if no such failure to enforce had occurred.

**20. SEVERABILITY AND HEADINGS:** Every term or condition of this Agreement is severable from others. Notwithstanding any possible future finding by a duly constituted authority that a particular term or provision is invalid, void, or unenforceable, this Agreement has been made with the clear intention that the validity and enforceability of the remaining parts, terms, and provisions shall not be affected thereby. The headings used in this Agreement are for general reference only and do not have special significance.

**21. GOVERNING LAWS/LANGUAGE:** This Agreement shall be governed and construed in accordance with the laws of the state of the Amec Foster Wheeler office entering into this Agreement. All communications relating to or arising out of this Agreement shall be in the English language.

US FFP 1-2015

**22. NONDISCRIMINATION AND AFFIRMATIVE ACTION:** Amec Foster Wheeler agrees to comply with Executive Order 11246 and the applicable federal regulations pertaining to nondiscrimination and affirmative action, including the Equal Opportunity Clause, the Affirmative Action Clause for Handicapped Workers, and the Affirmative Action Clause for Disabled Veterans and Veterans of the Vietnam Era. Further, Amec Foster Wheeler agrees that its facilities are not segregated.

**23. FIELD REPRESENTATION:** The Services do not include supervision or direction of the means, methods or actual work of other consultants, contractors and subcontractors not retained by Amec Foster Wheeler. The presence of Amec Foster Wheeler's representative will not relieve any such other party from its responsibility to perform its work and services in accordance with its contractual and legal obligations and in conformity with the plans and specifications for the project. CLIENT agrees that each such other party will be solely responsible for its working conditions and safety on the site. Amec Foster Wheeler's monitoring of the procedures of any such other party is not intended to include a review of the adequacy of its safety measures. It is agreed that Amec Foster Wheeler is not responsible for safety or security at a site, other than for Amec Foster Wheeler's employees, and that Amec Foster Wheeler does not have the contractual duty or legal right to stop the work of others.

**24. AUTHORIZATION TO SIGN:** The person signing this Agreement warrants that he has authority to sign as, or on behalf of, the CLIENT for whom or for whose benefit Amec Foster Wheeler's services are rendered.

**25. ANTI-BRIBERY:** The Parties undertake to protect the standards of business practice of the other Party at all times and to act in such a way as to uphold the good name and reputation of the other Party and not to do or attempt to do any act or thing which is intended to and/or which in fact causes any damage to or brings discredit upon the other Party and, in particular, the Parties will not:

(a)      Offer or give or agree to give to any director, officer, employee or agent of the other Party or any other entity any gift or consideration of any kind as an inducement or reward for doing or for forbearing to do or for having done or forborne to do any action in relation to the obtaining or execution of any contract or for showing or forbearing to show any favor or disfavor to any person in relation to any contract.

(b)      Induce or attempt to induce any officer, servant or agent of any private or public body to neither depart from his duties to his employer nor be involved with any such arrangement.

**26. ENTIRE AGREEMENT:** The terms and conditions set forth herein constitute the entire understanding and agreement of Amec Foster Wheeler and CLIENT with respect to the Services. All previous proposals, offers, and other communications relative to the provisions of these Services are hereby superseded. Any modification or revision of any provision set forth herein or any additional provision contained in any purchase order, acknowledgment, or other form of the CLIENT is hereby superseded and expressly objected to by Amec Foster Wheeler and shall not operate to modify this Agreement. Should CLIENT utilize its purchase order or any other form to procure services, CLIENT acknowledges and agrees that its use of such purchase order or other form is solely for administrative purposes and in no event shall Amec Foster Wheeler be bound to any terms and conditions on such purchase order or other form, regardless of reference to (e.g. on invoices) or signature upon (e.g. acknowledgement) such purchase order or other form by Amec Foster Wheeler. CLIENT shall endeavor to reference this Agreement on any purchase order or other form it may issue to procure Amec Foster Wheeler services, but CLIENT's failure to do so shall not operate to modify this Agreement.

IN WITNESS WHEREOF, CLIENT and Amec Foster Wheeler have caused this Agreement to be executed by their respective duly authorized representatives as of the date first set forth above.

| CLIENT | | | Amec Foster Wheeler Environment & Infrastructure, Inc. |
|---|---|---|---|
| By: | _____ | | By: |  _____ |
| Name: | _____ | | Name: | Timothy Regan, PE |
| Title: | _____ | | Title: | Client Manager/Principal Engineer |
| CLIENT | | | | |
| By: | _____ | | | |
| Name: | _____ | | | |
| Title: | _____ | | | |
| CLIENT | | | | |
| By: | _____ | | | |
| Name: | _____ | | | |
| Title: | _____ | | | |

US FFP 1-2015